**CAFFALL BROS. FOREST PRODUCTS, INC.**

v.

**The UNITED STATES.**

No. 377–75.

United States Court of Claims.

May 5, 1982.

William F. Lenihan, Seattle, Wash., atty. of record, for plaintiff; James F. McAteer, Seattle, Wash., of counsel.

Zinora M. Mitchell, Washington, D. C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D. C., for defendant.

Before SKELTON, Senior Judge, and BENNETT and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Harry E. Wood, filed March 25, 1981, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision as hereinafter set forth,* it hereby adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

WOOD, *Trial Judge*: In this action, plaintiff, a corporation organized and existing under the laws of the State of Oregon, sues to recover damages for alleged breach of a 1969 timber sale contract (hereinafter described).

On May 21, 1976, defendant filed a motion for summary judgment herein. Following oral argument, defendant's motion for summary judgment was denied without prejudice by order dated April 12, 1977, and the case was remanded to the trial division for trial or other appropriate proceedings to ascertain the facts. Trial has been held, briefing has been completed, and the case is ready for decision.

Plaintiff principally contends that the volume estimate (a total of 13,300,000 board feet, or 13,300 MBF) of timber stated in the contract in suit constituted a warranty; that the said warranty was breached, in that the actual volume of merchantable timber cut and removed by plaintiff pursuant to the Skogi sale was some 3,514 MBF less than the estimated volume; that a contractual provision that the estimated quantities stated in the contract "are not to be construed as guarantees or limitations of the timber volumes to be designated for cutting under the terms of this contract" does not bar recovery for damages resulting from the shortfall in timber cutout; and that such damages amount to some $925,000, or, alternatively, to some $1,250,000.

Defendant denies any breach of contract. Its position is that the contract volume estimate was not a warranty of quantity, that the contract contained an explicit and effective disclaimer of warranty, that while its volume estimate was unquestionably not accurate, plaintiff has failed to establish that the said estimate is, under *Timber Investors, Inc. v. United States*, 218 Ct.Cl. 408, 587 F.2d 472 (1978), an actionable one; and that, even assuming a breach of warranty, plaintiff's proof on damages is fatally defective.

For the reasons hereinafter appearing, it is concluded that plaintiff is not entitled to recover, and that the petition should be dismissed.

I

Some time prior to December 5, 1969, the United States Forest Service published and made available to prospective bidders, including plaintiff, an advertisement, a prospectus, and a bid form concerning a proposed timber sale (the Skogi sale). The Forest Service also published, and made available for inspection at a specified Forest Service office, a sample timber sale contract covering that sale.

---

* Although the court adopts the trial judge's separate findings of fact, which are set forth in his report, they are not printed. Also not adopted and deleted are footnote 24 and Part IV of the trial judge's opinion.

The Skogi sale advertisement indicated, among other things, that the Forest Service would receive sealed bids up to 9:00 a. m., December 2, 1969, for an estimated 13,300 MBF (thousand board feet) of timber marked or otherwise designated for cutting, that applicable "Purchaser road credits are $264,764.00",[1] and that full information concerning the timber, conditions of sale, and bidding should be obtained at a designated Forest Service office.[2]

The Skogi sale prospectus stated that the sale area, and a sample timber sale contract, should be inspected before submitting a bid. There is no evidence that the provisions of the sample timber sale contract either differed in any material way from the information in the Skogi sale prospectus, or were in any way revised prior to award of the Skogi contract to plaintiff. The Skogi sale prospectus also reflected an "Estimated Volume" of 2,000 MBF of Douglas fir, and of 11,300 MBF of Pacific silver fir and other coniferous species, and a "Total estimated volume" of 13,300 MBF.[3]

The prospectus also stated, among other things, (1) that certain described "Specified Roads" were to be constructed by the purchaser of the Skogi sale, that "Applicable road credits up to * * * " $264,764 would be "credited to Purchaser's Timber Sale Account as roads are constructed and accepted"; (2) that "Purchaser road credits may only be applied to timber charges in excess of timber values at Base Rates"; and (3) that volume, quality, and operating cost estimates were "made available with the understanding that costs and values shown are not estimates of a purchaser's own costs or recovery estimates", and that

for "these reasons, bidders are urged to examine the timber sale area and the sample Timber Sale Contract and make their own cost and recovery estimates."[4]

Cruising is the process by which the volume of merchantable timber (in board feet) in a given area is estimated. The process involves selection of sample areas or plots, an estimate of gross volume on those areas or plots, estimates of defects and of breakage, and extension of the sample results to the whole.[5] The final product is no more than an estimate, based on a statistical sample, of probable timber volume within a given area, and human or statistical errors at any part of the process obviously affect the validity of the ultimate conclusion.

Within both the Forest Service and the timber industry generally, cruisers strive for an estimate of volume within plus or minus 10 percent of the actual scaled cutout from a given area, and a cruise within those parameters is generally deemed an accurate one. The evidence is, however, that underruns are the rule rather than the exception: plaintiff's own experience with Mt. Hood and Gifford Pinchot National Forest timber sale contracts awarded between June 1969 and April 1973 was that underruns frequently exceeded 25 percent of estimated volume.[6] Considering all of such contracts (including those where overruns occurred) as a whole, the sum of the underruns exceeded 13 percent of the sum of the estimated volumes.

Moreover, in the course of prolonged negotiations with a committee sponsored by the National Lumber Manufacturers Association concerning the contents of a proposed new timber sale contract (which ulti-

1. "Purchaser road credits" will be discussed hereinafter.

2. The Skogi sale prospectus repeated the advice respecting availability of information from the Forest Service. The record does not establish that plaintiff sought any such information from the Forest Service prior to bidding on the Skogi sale.

3. The prospectus also indicated that 7,900 MBF of that timber could be exported.

4. The proposed Skogi sale had been cruised by the Forest Service in August 1968.

5. In the area here relevant, 10 or 20 percent sampling was deemed suitable.

6. Some underruns approached 50 percent of the estimated volume. One witness with wide experience in the timber industry testified that his company had experienced underruns (and overruns) of 30 to 40 percent on Forest Service timber sale contracts. Cruising is plainly more in the nature of a guess than a science.

mately became Forest Service Timber Sale Contract Form 2400–5, the contract form on which the Skogi contract was prepared), the Forest Service expressly rejected an industry proposal that the Service "warrant" within 10 percent the final net volume of timber to be cut pursuant to a Forest Service timber sale contract. With respect to sales (such as the Skogi sale) where the marking of timber was to be completed prior to sale advertisement, the industry in effect abandoned its request for such a warranty.

As of 1969, plaintiff was an experienced timber company with a history in the timber business dating back nearly 50 years. Its principal business activity at that time was log merchandising (the purchase, sale, and trading of logs), and it was actively engaged in the export of logs (primarily so-called "white woods", or true firs, including Noble fir and hemlock) to Japan. It then had on its books some 10 to 12 timber sales in various stages of activity, its logging program developed about 70,000 MBF of timber per year, and its annual sales volume was on the order of $30,000,000.

Before bidding on the Skogi sale, the head of plaintiff's forestry department and some of his staff spent a total of about six man-days examining the Skogi sale area. Plaintiff's examination resulted in several conclusions: that the timber on the sale area was of a type of interest to plaintiff; that the cruise information on the Skogi sale prospectus appeared reasonable; that there was probably enough Noble fir on the Skogi sale area to fill most of the export allocation of 7,900 MBF; and that the Skogi sale's estimated volume of 13,300 MBF "would be there." [7]

**7.** Neither the precise method by which this latter conclusion was reached, nor the amount of time available to plaintiff to examine the sale area and make its own estimate of timber recovery, can be determined from the record. In this state of events, however, it cannot be concluded that there was an inadequate opportunity for such examination and estimate.

**8.** Section B2.4, asserted by defendant to be an effective disclaimer, is quoted hereinafter.

Plaintiff thereafter submitted a timely bid on, and, on December 5, 1969, was awarded, Contract 02085–3 (hereinafter sometimes the Skogi contract). Pursuant to the contract terms, defendant, acting through the Acting Forest Supervisor, Mt. Hood National Forest, Region 6, Forest Service, Department of Agriculture, agreed to sell and permit plaintiff to cut, and plaintiff agreed to purchase and cut, "included timber" in eight clearcutting units covering 177 acres, more or less, in the Estacada Ranger District, Mt. Hood National Forest, Oregon.

Section A2, "Volume Estimate * * * applicable to * * * B2.4" [8] listed under the heading "Estimated Quantity", 2,000 MBF of Douglas fir logs and peeler blocks, 11,300 MBF of Pacific silver fir and other coniferous species, and a "Total" estimated quantity of 13,300 MBF. [9]

Section A5, "Timber Payment Rates * * for Species * * * ", incorporated a unit of measure of "M bd. ft.", and provided in part as follows: [10]

| | Rates per Unit of Measure | | | |
|---|---|---|---|---|
| Species * * * | Base | Advertised | Bid Premium | Bid |
| Douglas-fir logs and peeler blocks | $3.00 | $23.75 | – | $23.75* |
| Pacific silver fir and other coniferous species of logs | 2.00 | 21.95 | $3.55 | 25.50 |

* Advertised at a fixed rate.

Section B2.4, referenced in Section A2, "Volume Estimate", provided as follows:

Listed in [Section A2] Table 1 are the estimated volumes of timber designated for cutting under B2.3, expected to develop under the Utilization Standards stated therein. If Sale Area Map indicates

**9.** The Skogi contract explicitly stated that Section B2.41, "Adjustment for Volume Deficit", among other "Standard Provisions" was inapplicable.

**10.** Base rates were the lowest rates of payment for timber authorized by the contract. Advertised rates were the minimum acceptable bid rates for timber. Bid premium rates were the amount by which the purchaser's bid was in excess of advertised rates. Bid rates were the rates bid by the purchaser, and were the sum of advertised rates and bid premium rates.

there are subdivisions where timber designation is to be done after date of sale advertisement, the objective of the Forest Service shall be to designate for cutting under B2.3 the approximate estimated volume by species or species groups stated in Table 1. The estimated quantities stated in Table 1 are not to be construed as guarantees or limitations of the timber volumes to be designated for cutting under the terms of this contract.

Under the Skogi contract, there were no subdivisions where timber designation was to be done after the date of sale advertisement.

The Skogi contract required that plaintiff construct (or reconstruct) several "specified roads", and specified a "purchaser credit limit" of $264,764 for such construction (and reconstruction). Section B4.22, "Purchaser Credit", provided in pertinent effect that plaintiff would become entitled to purchaser credit by such construction and reconstruction. Section B4.22 also provided, however, that the purchaser credit limit (1) was "the maximum amount of credit which can be recognized hereunder for road construction * * * ",[11] and (2) "shall never be in excess of the total estimated cost of the listed roads or road segments actually constructed."

In effect, the Skogi contract granted purchaser credits (to a stated maximum amount) for completed road construction to plaintiff. Earned but unused purchaser credits in plaintiff's Timber Sales Account could be offset against stumpage payments, *in excess of base rates*, due from plaintiff to defendant for timber cut and scaled.[12] Under the terms of the Skogi contract, however, base rates could only be paid in cash, not by an offset of earned purchaser credits.

The Skogi contract's termination date (as extended in 1972 at plaintiff's request) was July 15, 1973. Plaintiff began logging the Skogi sale in 1970, and by October 23, 1972, all work under the Skogi contract except logging and cleanup of Unit 8, stream cleanout in Unit 6, and final road maintenance, had been completed. In other words, seven of the eight clearcutting units specified in the Skogi contract had been logged by October 23, 1972. None of those seven units had yielded as much timber as the Forest Service's appraisal had indicated, and plaintiff knew, or at the very least should have known at that time (if not even before then) that the actual final cutout volume from the Skogi sale would fall far short of the estimated volume.[13]

Logging on the Skogi sale was completed by the end of June 1973. Actual gross volume from the sale was 10,117 MBF, and the net merchantable volume of timber actually cut, removed, and paid for pursuant to the Skogi contract was 9,785.83 MBF, 3,514.17 MBF less than the estimated volume of 13,300 MBF, or a shortfall of 26.4 percent. The Douglas fir cutout shortfall (1,105 MBF versus a volume estimate of 2,000 MBF) was 44.75 percent, while the Pacific silver fir and other coniferous species cutout shortfall (some 8,681 MBF versus a volume estimate of 11,300 MBF) was about 23 percent.

Plaintiff fully performed its road construction (and reconstruction) obligations under the Skogi contract to the satisfaction of the Forest Service. Its total earned purchaser credits thereunder were $299,883.[14] Because the Skogi contract permitted offset of earned purchaser credits only against stumpage payments (in excess of base

---

**11.** The originally stated purchaser credit limit ($264,764) was subsequently increased to $299,883 as a result of Forest Service design changes.

**12.** The contract contained no other provision for reimbursing plaintiff for road construction costs.

**13.** Of course, the exact amount of the shortfall in board feet could not be determined in Octo-

ber 1972, but the fact of a shortfall, and a substantial one, was or should have been apparent to plaintiff by or even before that date.

**14.** Plaintiff's actual cost of specified road construction pursuant to the Skogi contract exceeded the estimated cost of such road construction. Such a situation frequently occurs. Plaintiff regards such excess costs "almost like a logging cost."

rates) due for timber cut and scaled, and because of the volume underrun just described,[15] plaintiff was able to apply earned purchaser credits of only $226,929.55 to the purchase of timber pursuant to the Skogi contract; earned purchaser credits of some $72,953.45 could not be so applied.

By letter dated July 30, 1973, to the Forest Service, plaintiff stated in substance that the Skogi "sale expired" July 15, 1973, that although plaintiff had earned purchaser credits of $299,883, it had been able to apply only $226,929.55 of such credits to stumpage payments, and that the result was "a deficient allowance for our road construction of $72,953.45." Plaintiff requested payment of the latter sum, but stated that it would accept additional timber from the Skogi sale in lieu of monetary payment. The Forest Service declined either to pay the amount requested or to make additional timber available to plaintiff. This action followed.

## II

With respect to liability, plaintiff contends that "the stated contract volume, when coupled with the purchaser credit limit, constituted a warranty". In support of this contention, it specifically asserts that, in *Timber Investors, Inc. v. United States*, 218 Ct.Cl. 408, 587 F.2d 472 (1978), the court "authoritatively settled" that a prospective purchaser of Forest Service timber is entitled "to rely on statements of fact in timber sale contracts * * * ", and that that holding necessitates a decision here that the estimated timber volume stated in the Skogi contract amounted to a warranty as to the quantity of timber available pursuant to that contract.

Plaintiff also contends that Section B2.4, said by defendant to be an effective and unambiguous disclaimer of any warranty of timber quantity, is ineffective, alternatively ambiguous and therefore to be construed against defendant, and in any event unconscionable and as a matter of public policy not to be enforced so as to preclude liability to plaintiff.[16]

### A

"In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 699 (1964); see also *Paccon, Inc. v. United States*, 185 Ct.Cl. 24, 31–32, 399 F.2d 162, 166–67 (1968); cf. *Everett Plywood & Door Corp. v. United States*, 190 Ct.Cl. 80, 90–92, 419 F.2d 425, 430–31 (1969).

Careful consideration of the relevant facts of this case leads to the conclusion that defendant did not warrant that plaintiff would be able to purchase, cut and remove 13,300 MBF of merchantable timber from the Skogi sale, that plaintiff was told to rely upon, and in fact did rely in substantial part upon, its own investigation of the proposed Skogi sale, and that in all the circumstances the estimated quantity of timber stated in the Skogi contract was not "the basis of the agreement" between plaintiff and defendant. *Everett Plywood & Door Corp. v. United States, supra*, 190 Ct.Cl. at 94, 419 F.2d at 433.

Both the Skogi sale advertisement and the Skogi sale prospectus referred to estimated volumes of timber. The Skogi pro-

---

**15.** Virtually all of the estimated volume stated in the Skogi contract would have had to be cut and removed for plaintiff to be able to apply all of its earned purchaser credits to stumpage payments. The margin between timber values above base rates and the contract purchaser credit limit was very thin.

**16.** A claim for prejudgment interest pursuant to the Contract Disputes Act of 1978, 92 Stat.

2383, 41 U.S.C.A. § 601 et seq. (1980), asserted by way of amendment to the petition at trial, is deemed abandoned. *Nossen v. United States*, 189 Ct.Cl. 1, 18, 416 F.2d 1362, 1371 (1969). Cf. *Monroe M. Tapper & Assoc. v. United States*, 222 Ct.Cl. 34, 611 F.2d 354 (1979). Plaintiff's damages arguments are hereinafter treated.

spectus explicitly advised prospective bidders that the estimated timber volumes were not estimates of a purchaser's own recovery, and that prospective bidders should therefore examine the timber sale area and make their own recovery estimates. Plaintiff made such an examination and reached its own conclusions as to the available volume, and there is no proof that plaintiff's opportunity for examination of the timber sale area was inadequate. And, the timber sale contract covered the purchase and sale of "Included timber", of a total *"Estimated* quantity * * * " of 13,300 MBF. (Emphasis supplied.)

Moreover, plaintiff, with considerable experience in Forest Service timber sale contracts, was necessarily aware when it submitted a bid on the Skogi sale that the timber volume estimates in the Skogi sale prospectus and contemplated timber sale contract were the product of a Forest Service cruise.[17] The final product of a cruise is no more than an estimate, based on a statistical sample, of probable timber value in a given area. Although cruisers strive for an estimate of volume within plus or minus 10 percent of actual scaled cutout, the process of cruising plainly does not lead to a precise and scientifically derived end result. Variations of more than plus or minus 10 percent were common. *Cf. Russell & Pugh Lumber Co. v. United States,* 154 Ct.Cl. 122, 128–29, 290 F.2d 938, 942 (1961). Indeed, in negotiations leading to the promulgation of Timber Sale Contract Form 2400–5, the Forest Service had rejected industry efforts to obtain a warranty of volume of plus or minus 10 percent, and the industry in effect acquiesced insofar as sales such as this one (where timber to be cut was marked prior to sale advertisement) were concerned. The record does not reflect that plaintiff participated in or knew of such negotiations. In cases such as this, however, industry practice was plainly not to interpret Forest Service estimates of timber volume as guarantees, and that practice was both reasonable and relevant.

And, within plaintiff's own experience, cruise estimates were frequently off by a substantial percentage, and underruns were the rule rather than the exception. In light of the foregoing, and even without the clear indications in the Skogi prospectus and contract that the stated timber volume estimates were just that, the conclusion that either plaintiff or defendant reasonably understood those estimates to be guarantees of timber volume would be unjustified. *Dale Constr. Co. v. United States, supra.*

Plaintiff's assertion that the Skogi contract's estimated timber volumes were "coupled with the purchaser credit limit", and that, so "coupled", they somehow amounted to a warranty of volume, is also unpersuasive.

As held hereinabove, the estimated timber volumes stated in the Skogi contract were not warranted. The contract provided clearly that the only method by which plaintiff could recover its road construction costs was by applying earned purchaser credits (to a stated purchaser credit limit) to stumpage payments (in excess of base rates) due from plaintiff for timber cut and purchased from the Skogi sale. The mere inclusion in the contract of the purchaser credit limit did not serve to convert estimated timber volumes into guaranteed ones.

The timber volume shortfall, together with the contract provisions that earned purchaser credits might be offset only against stumpage payments (in excess of base rates) due for timber cut and scaled, did result in plaintiff's inability to apply some $72,953.45 in earned purchaser credits to the purchase of timber under the Skogi contract. Plaintiff was necessarily aware of the contract limitations respecting use of earned purchaser credits, however, and the total estimated volumes stated were not guaranteed. Moreover, there was obviously a clear possibility, if not a probability, from the very outset that the Skogi contract would result in a timber volume underrun.

17. As noted above, plaintiff's pre-bid examination of the timber sale area had resulted in the conclusions that the cruise information in the

Skogi sale prospectus appeared reasonable, and that the stated estimated volume "would be there."

It must be concluded, on this record, that plaintiff assumed the risk volume cutout might be insufficient to enable it to offset the purchaser credits it expected to earn through road construction against stumpage payments (in excess of base rates) up to the purchaser credit limit. That the risk materialized, and that plaintiff was thus not able to recover all of its earned purchaser credits, is not in itself a sufficient basis for holding that plaintiff is therefore entitled to recover damages for breach of warranty.[18]

In *Everett Plywood & Door Corp. v. United States, supra,* the court did hold that a warranty of quantity of timber was extended to the plaintiff by defendant. There, however, the contract and related documents all stated flatly that there was a total of 73,100 MBF of merchantable timber to be cut on the sale, and none of those documents "contained a disclaimer of warranty as to quantity, or any cautionary language to the effect that prospective purchasers should not rely on the defendant's cruise estimate." These (and other) factual differences[19] between *Everett Plywood* and this case serve to make the court's holding there entirely inapposite here.

*Timber Investors, Inc. v. United States, supra,* is also of no help to plaintiff. The holding in that case (involving Forest Service estimates of road construction costs) was plainly not that the Forest Service warranted the accuracy of such estimates. Indeed, the court there held that the plaintiff in that case bore, but had failed to carry, the burden of proving that such estimates were "grossly or unreasonably inaccurate." *Timber Investors, Inc. v. United States, supra,* 218 Ct.Cl. at 423, 587 F.2d at 480. Plaintiff's interpretation of the holding in that case is an erroneous one.

In *Timber Investors,* the court did observe, by way of dictum, that contract provisions indicating that road construction cost estimates were "just that and were not to be considered as guarantees of any kind * * * standing alone would not insulate the government from liability if the contract estimates were so grossly erroneous as to indicate a failure to exercise reasonable care and diligence in arriving at said estimates." Even assuming the relevance of that dictum in the very different factual context of this case, plaintiff can derive no comfort therefrom. *Id.,* 218 Ct.Cl. at 415 n. 4, 587 F.2d at 475–76 n. 4.

Plaintiff cut from the Skogi sale a total of some 1,105 MBF of Douglas fir (some 895 MBF less than the estimated volume of Douglas fir stated in the Skogi contract, or a shortfall of 44.75 percent), and some 8,691 MBF of Pacific silver fir and other coniferous species (some 2,619 MBF less than the estimated volume of such species stated in the Skogi contract, or a shortfall of about 23 percent). The total shortfall was 3,514.-17 MBF, or 26.4 percent of the total estimated volume of 13,300 MBF.

There was, in sum, a large, but not unprecedented, volume shortfall in connection with the Skogi contract. Why that shortfall occurred is not shown. It cannot fairly be concluded, however, that the Forest Service's timber volume estimates in connection with the Skogi sale were inadequately or negligently prepared, not in good faith, or grossly or unreasonably inaccurate. That those estimates were not precisely accurate does not, in and of itself, confer on plaintiff a right to recover damages for the shortfall. *Timber Investors, Inc. v. United States, supra; Womack v. United States,* 182 Ct.Cl. 399, 414, 389 F.2d 793, 802 (1968);[20] *Russell & Pugh Lumber Co. v.*

---

18. A separate *quantum meruit* argument respecting earned purchaser credits is considered hereinafter.

19. Among others, an independent cruise of the timber offered for sale was a practical impossibility, and the Forest Service "must have assumed" that prospective bidders "would have to rely upon the accuracy of defendant's cruise." *Everett Plywood & Door Corp. v.*

*United States,* 190 Ct.Cl. 80, 91, 419 F.2d 425, 431 (1969). Here, the Forest Service told plaintiff to make its own estimates of recovery, and plaintiff did examine the timber sale area.

20. In *Womack,* the court stated that "Assuming that the bidder acts reasonably, he is entitled to rely on Government estimates as representing honest and informed conclusions." *Id.,* 182 Ct.Cl. at 412, 389 F.2d at 801. Here, plain-

*United States, supra; cf. Maurice Mandel, Inc. v. United States,* 424 F.2d 1252, 1254 (8th Cir. 1970) (use of word "estimate" does not cast responsibility for gross miscalculation upon a bidder).

In this connection, different methods of measuring or estimating log diameters, and bucking logs to lengths differing from the lengths assumed in the cruise, may result in scale volumes differing from estimated cruise volume. Breakage and defects (hidden or otherwise) obviously may as well. And, sampling plots or areas of standing timber, on a 10 or 20 percent basis, and then extending the results to the entire area, clearly presents an independent potential for distortion of the resulting cruise estimate. Unexplained differences, even substantial ones, standing alone, do not establish negligence, bad faith, or gross or unreasonable error.

### B

The conclusions just stated make it unnecessary to consider at any length either the effectiveness *vel non* in the abstract of the provisions of Section B2.4 as a disclaimer of warranty of volume, or whether Section B2.4 is either ambiguous or unconscionable and as a matter of public policy not to be enforced so as to preclude defendant's liability to plaintiff. Section B2.4 does, however, deserve brief scrutiny.

Section B2.4 is captioned "Volume Estimate"; its first sentence provides as follows: "Listed in Table 1 are the *estimated* volumes of timber designated for cutting under B2.3 *expected* to develop * * *." (Emphasis supplied.) Consistently with the Skogi contract provisions and related documents, the focus of Section B2.4 is upon estimates, not warranties, of timber volume.

The second sentence of Section B2.4 relates to designation of timber *after* date of sale advertisement, a factual situation not relevant here. The third, that "The estimated quantities stated in Table 1 are not to be construed as guarantees or limitations of the timber volumes *to be designated* for cutting under the terms of this contract" (emphasis supplied) is said by defendant to be effective and unambiguous; plaintiff asserts, however, that it is ambiguous; and that it was "reasonable for plaintiff to interpret the third sentence of B2.4 as being inapplicable to the Skogi timber sale contract."

Whatever else might be said respecting the assertion that the third sentence of Section B2.4 (in essence echoing the warning to bidders in the Skogi sale prospectus), is ambiguous, the factual assertion that in bidding plaintiff interpreted that sentence as inapplicable to the Skogi sale is neither supported by citation to the record nor established by the proof.

Be that as it may, the holding that the Forest Service did not warrant or guarantee that plaintiff would cut and remove 13,300 MBF of timber from the Skogi sale does not depend upon a conclusion that Section B2.4, in and of itself, amounted to an effective and unambiguous disclaimer. In this case, the determination that no such warranty or guarantee was made is adequately grounded on other considerations, expressed above.[21]

In its reply brief, plaintiff devotes considerable attention to a recent holding in *McGrew Bros. Sawmill Co. v. United States,* 224 Ct.Cl. —— (1980), where the court denied cross-motions for summary judgment because of disputed material facts, and remanded the case for trial or other appropriate disposition. Parenthetically, the petition in that case was dismissed on plaintiff's

---

tiff relied at least in substantial part on its own examination of the timber sale area. Moreover, and in any event, defendant is not "required to be clairvoyant", but only "to base that estimate on all relevant information that is reasonably available to it". *Id.,* 182 Ct.Cl. at 412 13, 389 F.2d at 801. No breach of that duty appears.

21. The issue of unconscionability of Section B2.4 is not reached. *Cf. Fraass Surgical Mfg. Co. v. United States,* 215 Ct.Cl. 820, 830, 571 F.2d 34, 40 (1978) (Uniform Commercial Code Section 2-302 "is not intended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise.")

motion, pursuant to Rule 102(a)(1)(ii), January 30, 1981.

■ In *McGrew*, the parties differed, as they do here, over the meaning and effect of "disclaimer" language in a Forest Service timber sale contract. Since the disposition of this case does not turn upon whether or not Section B2.4 was an effective and unambiguous disclaimer, in and of itself, plaintiff's arguments that under *McGrew*[22] Section B2.4 is ambiguous as a matter of law require no further discussion.[23]

## C

■ Plaintiff further contends that because of its inability to apply all of its earned purchaser credits by way of offset against stumpage payments (in excess of base rates) due from plaintiff for timber cut and purchased on the Skogi sale, violations of law and of regulations occurred, and that it is accordingly entitled to "compensation measured on a *quantum meruit* based upon an implied in fact contract that defendant agreed to pay the fair and reasonable value of the road construction." In plaintiff's words, "the government was required to furnish sufficient timber to fully amortize the road." Section 535, Title 16, United States Code (1970), and 36 C.F.R. Section 221.7(c) (1970), are cited in support of this proposition.

As in force at the time here relevant, Section 535 provided simply that financing of forest development roads within National Forests administered by the Forest Service might be accomplished by, *inter alia*, "requirements on purchasers of national forest timber and other products, including provisions for amortization of road costs in contracts." 36 C.F.R. Section 221.7(c) provided that the estimated cost of construction of specified roads should be "deducted from stumpage payments made by or due from Purchaser under the timber sale con-

tract for other than minimum stumpage rates * * *."

No violation of either statute or regulations is apparent here. There were in substance provisions for "amortization" of road costs in the Skogi contract. That plaintiff could not fully apply earned purchaser credits to stumpage payments cannot properly be construed as a violation of Section 535. 36 C.F.R. Section 221.7(c) also does not mean that absent full application of earned purchaser credits to stumpage payments, there exists a monetary claim against the United States enforceable in this court for the amount of the earned purchaser credits not so applied.

Plaintiff's *quantum meruit* argument starts with the proposition that an express written contract in violation of law or regulations is invalid. Assuming, for present purposes, the validity of that proposition, the conclusion that plaintiff is accordingly entitled to recover for its costs of road construction under the Skogi contract nonetheless fails. The connecting link between the proposition and the conclusion—*i.e.*, plaintiff's contention that the Skogi contract unlawfully failed to provide that plaintiff might fully apply purchaser road credits to stumpage payments—does not withstand scrutiny.

## III

Plaintiff is not entitled to recover. Accordingly, discussion of plaintiff's damage position may be largely pretermitted. It should briefly be noted, however, that there are grave deficiencies in plaintiff's approach to the matter of its asserted "damages for non-delivery of timber." Plaintiff's claim of damages of some $925,000, or, alternatively, some $1,250,000, in consequence of the Skogi contract timber shortfall, rests on a considerable number of untenable assumptions. Even were defendant liable to plaintiff here, the claims as made could not be deemed valid.

---

**22.** The factual questions posed by the court in *McGrew* are relevant to the issues here, and to the extent permitted by the record they have been considered in reaching this opinion.

**23.** Plaintiff's notion that there is some sort of "implied warranty", where timber is designated before cutting, that either a certain cutout will result or that additional timber will be designated for cutting, has no support in fact, law, or logic.

## CONCLUSION OF LAW

Upon the foregoing opinion and findings of fact set forth in the trial judge's report which are adopted by the court, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.