**DEAL and Van Zandt,[1] Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 434–77.**

United States Claims Court.

Aug. 3, 1983.

---

1. The spelling of plaintiff Arnold Van Zandt's name incorrectly appeared as "Van Zant" in the petition and other papers filed with the court. As a result of documents filed during trial, the correct spelling, as appears in the caption, was discovered.

Lynn Hubbard, III, Chico, Cal., for plaintiffs.

Ray Goddard, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge:

In this action plaintiffs are seeking to recover damages for the alleged breach of a timber sale contract. Plaintiffs, in particular, complain that the contract called for a volume of 971 thousand board feet (MBF) of timber, but that in fact only 441,970 board feet were obtained. Based on the facts of this case as described below, plaintiffs have not established that the government breached its contract. Thus, plaintiffs' complaint must be dismissed.

### Facts

On or about August 27, 1974, plaintiffs Lester K. Deal and Arnold Van Zandt, partners engaged in the business of logging, entered into a timber sale contract with defendant, the United States, acting through the Department of Agriculture's Forest Service. The sale was an advertised salvage sale [2] for an estimated 971 MBF of timber in the Beckwourth District of the Plumas National Forest. The sale timber consisted of blowdown, or green trees which were the victims of winter storms, and standing trees affected by various kinds of corruption, such as disease or bug infestation.

Pursuant to the contract, the defendant agreed to sell and the plaintiffs agreed to purchase "all timber marked with YELLOW paint and designated for cutting by the Forest Service, merchantable as hereinafter defined, located on an area to be designated by the Forest Service before cutting begins in * * * [various sections]." The contract defined "merchantable" trees as those having one or more merchantable logs. Logs were considered merchantable for the purpose of the contract if they were not less than 10 ft. long, at least 10 in. in

2. A salvage sale, which is to be distinguished from a "green" sale, includes only dead or dying trees. The purpose of a salvage sale is to quickly recover dead and dying trees which would otherwise rot away and be of no use or value.

diameter inside the bark at the small end, and containing a net of 33⅓% of their gross scale. No log scaling less than 30 board feet was to be considered merchantable.

The contract further stated that the purchaser was to pay the Forest Service $22,-690.59 for the timber, which amount included plaintiffs' lump-sum bid of $22,506.10, and a slash disposal deposit of $184.49. The contract set out the "Estimated Quantity and Unit" of the timber for sale, as well as the "Species and Product" under three categories, as follows:

*Live and recently dead (sound sapwood) timber:* 406 MBF    WF & RF [white fir and red fir]

*Older dead (unsound sapwood) timber:* 555 MBF    WF & RF

*Recently dead and older dead timber:* 10 MBF    WWP (ALL) [Western white pine]

Prior to the date of the contract, the Forest Service made available to the prospective bidders several pieces of information relative to the "Haskell Salvage Sale," as the sale at issue was known. These included the advertisement of the sale, a prospectus, a bid form, and a sample contract. Also available at that time was an appraisal summary done by the Forest Service on the Haskell Salvage timber. The advertisement provided, along with other information, the minimum lump-sum [3] acceptable bid amount for the estimated 971 MBF.[4] Both the prospectus and the bid form broke down the lump-sum minimum bid amount by category of timber being sold. The sound sapwood was advertised at $25.96 per unit, the unsound sapwood for $10.66 per unit, and the pine timber for $3.00 per unit.

The prospectus described the sale as "a salvage sale involving extensive blow-down, with dead, dying and down timber only, included." Prospective purchasers were urged to evaluate the area for themselves before submitting a bid. The prospectus noted that the timber to be removed had been 100% premarked and the volumes listed were shown as estimates. The bid itself recommended that bidders "inspect the sale area, review the requirements of the sample timber sale contract, and take such other steps as may be reasonably necessary to ascertain the location, estimated volumes, quality, development, and operating costs of the offered timber." The appraisal summary showed a timber estimate of 971 MBF and showed the unsound sapwood at a bid value of approximately 40% of the sound sapwood, *i.e.,* $10.66 versus $25.96. Nowhere in any of the documents was a distinction made between net and gross volume.

Plaintiffs, at least one of whom, Mr. Deal, had been in the timber business since 1969, did not inspect the sale area before signing the contract. One of plaintiffs' agents did "eyeball" the area prior to the signing, but made no report to plaintiffs as to the volume of timber which had been marked for harvest. Shortly after the contract was signed, another of plaintiffs' agents went through the area where the timber was located and, as a result of his survey, advised plaintiffs, belatedly, not to sign the contract because he thought the timber volumes were not as great as the Forest Service had estimated.

The estimates which appeared in the Forest Service materials were the result of a timber cruise by teams of Forest Service employees. Two teams spent a total of 18 man-days carrying out the cruise. Each member of the team was a certified cruiser which meant, among other things, that he was able to estimate timber volume to within a margin of error of 10%. The cruisers received instructions from a supervisor who explained the manner in which the cruise was to be conducted. Essentially, the cruise was a sampling of all the trees which had been premarked with yellow paint for harvest. The sampling method employed resulted in the selection of some 87 trees

---

**3.** A lump-sum bid is one which calls for a single full payment for a predetermined amount of timber.

**4.** The minimum acceptable bid was $16,486.06.

out of 1,032, or approximately 8.4%, to be measured.

Once a tree was selected for measuring, the cruiser recorded certain information, including the diameter of the tree at breast height (DBH) and the number of 16-ft. logs which could be obtained from the tree. They also looked for defects, and noted this information for that particular tree. The sound trees having the minimum dimensions mentioned in the contract were measured net of certain obvious defects, such as breakage. Unsound trees, by their very nature, do not lend themselves easily to net volume estimates because the extent of the internal deterioration is not evident until after they are cut down and bucked. However, just as in the case of sound trees, the unsound trees were measured net of all obvious defects. The raw data compiled by the cruisers was returned to the cruise supervisor who computed the actual estimated volume.

Following the execution of the timber contract, plaintiffs sent their crew into the sale area. Plaintiff Deal instructed the crew to remove all trees having a yellow "cut mark." The process began with a cutter, whose job it was to actually fell the timber and cut it into logs for skidders to either stack in decks or load upon trucks. When logs are removed for shipment to a mill from a sale area, the Forest Service gives the trucker a ticket for each load which identifies the destination of the logs, the amount of logs, the sale name, and the buyer's designated brand. When the timber arrives at the mill, the tickets are sent back to the forest ranger for the sale area. By this means, the ranger may keep track of the timber for export restriction purposes. Logs which are not to be immediately removed from the area are stacked into decks to preserve them from deterioration. Both decking and cold weather help prolong the life of rapidly deteriorating species, such as the fir in the Haskell Salvage Sale, for one more season.

The cutter in this particular contract was paid by the number of board feet that were actually netted from the downed trees.

For this reason, instead of cutting down all trees with a yellow cut mark, he exercised his judgment, eliminating trees with a DBH of 13 in. or less as being unprofitable. For ecological reasons, he also spared other trees which were located in meadows or streams and whose removal, in the judgment of the cutter, would have damaged the stream beds.

Mr. Deal testified that a total of 441,970 net board feet had been harvested from the area by 1975. A review of the evidence of record shows that plaintiffs obtained a yield of net board feet at a rate of approximately .68 of the gross amount harvested. Plaintiffs complained to the Forest Service that the estimates involved in the sale were seriously deficient, and that they believed under the circumstances they were entitled to some kind of relief. Subsequently, the Forest Service recruised the sale area and discovered an additional 162,380 board feet of timber which had been marked for removal, but which had not been harvested.

When plaintiff Deal complained that the timber volume was short, the Forest Service told him that the sale was a lump-sum sale, that there would be no refund for the alleged shortage and that no additional timber would be made available to make up the shortage. By way of explanation, the Forest Service pointed out the different forms of commercial contracts which it can enter into for the sale of timber. A "sale by amount" is one for a definite quantity of timber and the amount felled by the purchaser cannot exceed that specified in the contract. However, if the amount designated falls short, the Forest Service is obliged to make the full quantity specified in the contract available. In contrast, the typical "sale by area" includes all the timber marked or designated for cutting in a specified area, but the volume estimate is not guaranteed. If there is more timber than estimated on the land, the purchaser has the right as well as the obligation to remove it, but there is no obligation on the part of the Service to make up the deficiency if the amount available is less than the estimate.

The Forest Service Manual describes the methods of measurement used by the Forest Service. "Scale sales" are those in which the volume is calculated following felling and may be used with either sales by area or by amount. "Pre-sale measurement sales" are sales in which trees are measured and volumes determined in advance of sale advertisement. These volume estimates are determined in one of several ways, including sample tree measurement, 100% tree measurement, or area estimate.

Bidding on timber sales contracts may be by lump sum, that is, on the basis of total appraised value, or on rates per 1,000 board feet. The amount bid for the salvage timber in this case was not broken down by category, but simply listed as a lump-sum bid of $22,505.10. Under the bid price on the sales contract appeared the words: "This sale is final—No refunds." The failure of the Forest Service to provide relief to plaintiffs for the alleged timber shortage is the basis of plaintiffs' complaint.

### Discussion

Plaintiffs argue that the focus of the discussion should be on the type of sale at issue and that the contract in this case was for 971 MBF of "net volume," as distinguished from a timber "sale by area" or a sale by gross amount. They allege that Forest Service employees measured 971 MBF of gross volume of timber and then represented that amount to be net merchantable timber in the contract; that is, net of defective or unusable timber. Plaintiffs maintain that the Forest Service scaled, or measured, this timber upon delivery to a mill and that the total yield was only 441,970 board feet of net volume. This deviation, according to plaintiffs, constituted a material misrepresentation of the net volume of merchantable timber and, given defendant's failure to make available additional timber volume, constituted a breach of contract.

Defendant's position is that the estimates were accurate to within 10%, a standard which must usually be met in a "sale by amount," but which has never been re-

quired in a salvage sale. More specifically, the government maintains, since this was actually a lump-sum area sale, there was no warranty of the amount estimated and thus no breach of contract. In addition, defendant argues that any damage suffered by plaintiffs was primarily due to their own lack of diligence.

I find in this case that the sale at issue was not a "sale by amount" as plaintiffs allege, and that the volume estimates provided by the government on the Haskell Salvage Sale did not constitute warranties of timber volume under *Clearwater Forest Industries, Inc. v. United States,* 227 Ct.Cl. 386, 650 F.2d 233 (1981). Further, I do not think that the estimates, even if overstated, were so "grossly erroneous as to indicate a failure to exercise reasonable care and diligence" in arriving at the estimates so as to make the defendant liable for the shortage. *See Timber Investors, Inc. v. United States,* 218 Ct.Cl. 408, 415 n. 4, 587 F.2d 472, 475–76 n. 4 (1978); *Clearwater Forest Industries, Inc.,* 227 Ct.Cl. at 396–97, 650 F.2d at 240. Thus, plaintiffs have not shown the necessary prerequisites to establish a breach of contract, and may not recover.

Under certain circumstances, the Forest Service, in effect, guarantees the amount of timber that it contracts to sell. These sales are called "sales by amount." According to the testimony of Mr. James Leoni, the Sales Preparation Officer at the Beckwourth Ranger District, who supervised the cruise of the Haskell Salvage Sale area, if there is a shortage in the volume stipulated in a "sale by amount," the Forest Service will mark more trees for harvest to make up the shortage. Mr. Leoni stated that he believed the current figure guaranteed was 90% of the estimate, but that, whatever the amount and the guarantee, there would be very clear language in the contract detailing the arrangement with the buyer for this type of sale.

With a "sale by area," on the other hand, there is no obligation on the part of the government to make up deficiencies in estimated amounts and the estimates, as the

case law makes clear, are not guarantees of volume.

It becomes imperative, then, in the instant case for plaintiffs to show that this sale is a "sale by amount," in order to demonstrate that the volume purchased was guaranteed within a percentage of the estimate. Alternatively, it appears that if the contract provides no warranty of volume, then plaintiffs, in order to recover, must show that the stated amounts, while estimates, are so "grossly erroneous" as to amount to a material misrepresentation of the volume.

Plaintiffs base their argument that the sale at issue was a scaled, net volume sale on several pieces of testimony, including that of Mr. Edwin Angwin, the forest ranger who signed the contract on behalf of the government. Ranger Angwin, when asked whether he would have considered the figure of 971 MBF in the contract to be a net or gross figure, responded that he would have considered it a net figure "unless it's otherwise specified." In addition, Lester Kent Deal, one of the plaintiffs, testified that the sample form contract led him to believe that the sale was for 971 MBF of "net merchantable timber" within a 5–10% margin of error. Finally, plaintiffs maintain that the Forest Service scaled the harvested trees, apparently suggesting that the actual measuring of the sale timber which took place upon delivery to the mill, supported their "sale by amount" theory. If plaintiffs are correct, then the amount of promised timber volume was short by as much as 50% of the estimated volume.

■ Plaintiffs' arguments that this is a sale of a net volume of timber are not persuasive, however. In fact, several things make it clear that this is not such a sale but, rather, is a "sale by area." The first is the description of these sales in the Forest Service Manual. The "sale by amount" clearly allows for more trees to be marked if the estimated volume is more than the designated timber produces. In such a sale, the timber is scaled by the Forest Service so the exact volume is known. The "sale by area" does not make

allowances for overestimates, but contracts with the buyer only to remove the designated timber.

The Forest Service has many silvicultural responsibilities and it is conceivable that there would be occasions when one or the other of these types of sales would be more appropriate and preferred. The testimony of record convincingly demonstrates that the sale to the plaintiffs was such an occasion, and that from the facts and circumstances surrounding the event a "sale by area" was intended. In this particular instance, the purpose of the sale was to clean up a designated portion of the Plumas National Forest and to salvage as much as was possible of the dead or dying trees as quickly as possible, and the presale materials made this manifestly clear. There was testimony at trial that a scaled sale would not be appropriate in a salvage situation largely due to the fact that much of the timber in a salvage sale is unsound, making estimates of net volume difficult, if not impossible. In light of this, plaintiffs' suggestion that the Forest Service meant an arrangement whereby it guaranteed net volume is untenable. If it were concluded that such an arrangement was intended in this instance, the Forest Service would have to make available an additional ½ million board feet of sound timber to cover the shortfall.

Further, it is quite clear from the sale prospectus that the trees to be taken were 100% premarked by a painted yellow cut mark. The testimony of record also unmistakably establishes that the Forest Service did not scale the sale timber. It simply tracked the truckloads of logs from the sale area to the mill. Such tracking was done for export control purposes and not, as plaintiffs urge, to enable the logs to be measured incidental to a sale by amount.

Finally, there is the testimony of Mr. Angwin that he would expect the estimates presented in the contract to represent net volumes unless otherwise indicated. Under the circumstances, it appears quite obvious that such a conclusion is "otherwise indicated." This conclusion stems from two items on the face of the contract itself.

The first is the characterization of the one category of timber as "unsound sapwood." This, coupled with the fact that that category of timber is advertised at a price of approximately 40% of that stated for the sound wood, strongly suggests that the estimate does not mean "net volume." In order to net 555 MBF from older dead timber (unsound sapwood), the record establishes that a gross amount of approximately 1,500 MBF would be required. Plaintiffs have not shown that such a volume of unsound sapwood was available in 1974. Furthermore, considering that the bid states that the quantities estimated are the total quantities of timber to be involved, and that the bid was a lump-sum, not per-unit bid, further argument is foreclosed that the contract could in some way be construed to provide for the inclusion of additional timber which would produce the net figures claimed by plaintiffs.

Plaintiffs make much of the language in the contract which outlines the obligations of the parties to buy and sell certain timber. Specifically, the contract provides that "[t]he Forest Service agrees to sell and the Purchaser agrees to purchase all timber marked with YELLOW paint and designated for cutting by the Forest Service, *merchantable as hereinafter defined * * *.*" (Emphasis added.) As previously explained, the term "merchantable" was defined as trees which would yield one or more logs, had a diameter of at least 10 in. at the small end, and contained a net of 33⅓% of their gross scale. In addition, if a log did not scale at least 30 board feet, it would not be considered merchantable.

Plaintiffs would apparently have the court interpret this language as a warranty that all timber marked for cutting was merchantable. If anything, I find the emphasized language is a limitation on both the rights and responsibilities of the plaintiffs as far as the timber they could remove, to specifically limit the trees to be cut to those marked with yellow paint and fitting the dimensions set forth. There was, in fact, testimony at trial which suggested that this language should not even apply in a salvage sale, that it was really meant for green

scaled sales so as to ensure that purchasers would harvest the smaller trees as well as the larger ones in a designated area. The form used for the Haskell Salvage Sale contract was apparently one which was used for many different sales and adapted for particular uses by filling in blanks and excising inapplicable portions of the form language as necessary. Whether the "merchantability" language was intended to remain in the contract for the salvage sale, or whether it is an unfortunate vestige from a scale sale of live timber, it is ineffective to support the contract interpretation urged by plaintiffs.

Having concluded that this is an area-type sale, rather than a "sale by amount," it becomes necessary to compute the total amount of timber the Forest Service actually did make available to plaintiffs and compare that with the estimates. This calculation is made difficult by the fact that there is no direct evidence of how much timber was removed, so this figure must be determined circumstantially. In addition, defendant claims that a substantial amount of timber was left in decks and on the ground by plaintiffs, while plaintiffs maintain they removed substantially all designated timber.

Plaintiffs admit that by the end of 1975, they had netted 441,970 board feet from the area. To project from this the gross amount of timber removed, it is necessary to know the gross/net ratio after scaling. Such information was available for only part of the timber sold by plaintiffs. The documents of record show that 552,000 board feet of timber which plaintiffs sold to the Essex Lumber Company yielded approximately 375,000 board feet of net volume. This information indicates that plaintiffs obtained a net yield of approximately .68 of gross volume. If this ratio is applied to plaintiffs' estimated net of 431,970, one may infer that this net volume was obtained from a gross volume of approximately 650,000 board feet.

Defendant insists that a 1978 recruise of the sale area showed that some 162,380

board feet of timber designated for removal from the area still remained in decks or on the ground. When this remaining timber is added to the gross volume of 650,000 board feet which plaintiffs removed, it would appear that the gross volume of timber available to plaintiffs came to 812,380 board feet.

Plaintiffs cannot seriously question the accuracy of the gross volume calculation. In the first place, the estimate that plaintiffs removed at least 650 MBF gross volume from the area is clearly established from the testimony and documents of record. The only doubt which might exist concerns how much, if any, timber the plaintiffs failed to remove from the sale area. It is difficult to ignore evidence presented in support of the defendant's assertions that some 162,380 board feet of timber were found in the area upon recruise in 1978. Part of this testimony was that of a master scaler who recalled that he came across some 12 decks of timber containing 74 MBF, for which cruise tickets were available. Further, Mr. Leoni testified that there were a number of trees in the 14–20 in. DBH category which had been left standing, and that even a 13-in. DBH tree would have given a merchantable log as described in the contract. The cutter for the plaintiffs said that he did not think that a tree having a 13-in. diameter was merchantable, and admitted that he would not have cut down such a tree. Finally, the 1978 recruise was attempting to uncover trees which were marked in 1974, and it is not unlikely that many of the trees originally marked had deteriorated to the point where they could not be identified. It may, therefore, be that, if anything, the recruise included fewer trees than were actually left behind in the sale area by plaintiffs in 1976.

The above reconstruction of the volume of timber which existed in 1974, even though it is based in part on projections and estimates, convincingly establishes that there were approximately 812,380 board feet of timber in the sale area marked for removal by plaintiffs. While the figures are not as concrete as I would like, I feel that they are reasonable approximations based on the best data available and are amply supported by the evidence of record. By the court's calculations, then, the defendant's estimate of gross timber was overstated by approximately 16%.

■ The ultimate question, then, is whether a 16% error in estimating the gross timber volume in a salvage sale gives rise to a breach of warranty on the part of the government. Under the circumstances presented by this case, the answer must be that there is no breach of warranty and that the plaintiff may not recover.

In *Clearwater Forest Industries, Inc.,* plaintiff complained that the actual timber cut under its contract was 14.48% less than the estimated volume stated in the sale prospectus and contract. Plaintiff also alleged that the estimated amount was warranted even though the contract specifically stated that the estimates contained therein were "not to be construed as guarantees or limitations of the timber volumes to be designated for cutting under the terms of this contract." 227 Ct.Cl. at 396, 650 F.2d at 239. The court, in *Clearwater,* recognized that:

> Forest Service timber volume estimates should be carefully made, since the Service itself recognized in 1975 that a prospective purchaser should reasonably be expected to base his operating plans and cost estimates on such figures. That recognition, however, falls far short of justifying the conclusion that such estimates are to be construed as warranties, in the face of contract language specifying otherwise.

*Id.,* 650 F.2d at 239–40.

In the contract at issue in this case, there is no specific language which clearly provides that the indicated volumes were not to be construed as guarantees. However, the timber volumes are described as estimates. In addition, the form on which plaintiffs submitted their bid clearly instructed plaintiffs, in the "Conditions Affecting Sale Compliance Prior to Bidding" section, to inspect the sale area and ascertain the estimated volumes themselves. Further, the sale prospectus identified the

sale as a salvage sale and again noted that the volumes were estimates of dead, dying and down timber. It stated that "Prospective purchasers are urged to evaluate the area for themselves. All timber to be removed has been 100% pre-marked." Nothing in the contract itself said anything which might blunt the impact of these cautionary words or suggested that the volume amounts were guaranteed. Indeed, the cumulative effect of the above statements was to alert all prospective bidders that the volumes were estimates only, and that to be on the safe side they should make an inspection of the area and form their own opinions regarding the volume of timber involved.

The facts in this case, as in *Clearwater,* are in sharp contrast to those in *Everett Plywood & Door Corp. v. United States,* 190 Ct.Cl. 80, 419 F.2d 425 (1969), wherein the court found that a warranty of timber quantity was extended to plaintiff by the Forest Service. In that case, a cruise was conducted and plaintiff agreed to purchase dead and live merchantable timber designated in a particular area. There, the volume of timber cut was substantially less than the amounts advertised in the prospectus and reflected in the contract. In *Everett,* as here, plaintiff contended it could rely on defendant's representations of the volume of merchantable timber and that it could recover for loss of stumpage and failure to recoup road development costs due to the shortage of timber. Defendant in *Everett,* as here, contended that this was a sale of a specific lot of timber for which there was no warranty of volume, and concluded that any variance between the estimate and amount cut was plaintiff's doing.

The court in *Everett* found that a warranty of a stated quantity of timber had been extended to plaintiff based on the cumulative effect of a number of facts and circumstances. The court noted first that none of the documents prior to the sale contained any disclaimer or cautionary language that the cruise estimates should not be relied on. Further, the judge noted that Forest Service employees had declined to use a new contract form containing such disclaimer language. The bidding in that case was also per unit, not lump sum, and the volumes specified were more a basis of the bargain. The Forest Service policy language additionally suggested that the purchaser could rely on the figures. It was not possible in *Everett* for an independent cruise to be conducted to verify the estimates, and costs in that case could only be recouped based on the full estimated volume. Finally, the court felt the sale did not fit the description of a timber sale by specific lots, or sale by area of land. Indeed, the boundaries describing the location of the sale area were vague and undefined.

In the instant case, of course, there was clear notice that the estimates should be reviewed by plaintiffs. The bidding was lump sum and did not suggest a unit bidding in which the volumes became the basis of the per unit bid. Here, not only could an independent cruise be conducted, but in fact one of plaintiffs' employees did look the area over prior to bidding. Moreover, plaintiffs in this case have made no showing, as was the case in *Everett,* that they have lost money on this contract because the volume of timber which they expected was not achieved. Finally, the sale timber here was 100% pre-marked, and there is nothing in the contract or any other documents of record to suggest that the sale was to be a sale by amount and was without restrictions as to boundaries or limits.

Our predecessor court suggested in *Timber Investors, Inc. v. United States* that the government would not necessarily be insulated from liability, even where bid documents and contract language stated that estimates are not guarantees, if the contract estimates were "so grossly erroneous as to indicate a failure to exercise reasonable care." 218 Ct.Cl. at 415 n. 4, 587 F.2d at 475–76 n. 6; *McGrew Bros. Sawmill, Inc. v. United States,* 234 Ct.Cl. 740, 744 (1980).

Plaintiffs have made allegations that the cruise was not conducted in a reasonable manner. Despite these allegations, they presented no evidence at trial attacking the integrity of the statistical methods of de-

fendant's cruise. In fact, defendant's evidence of the cruise methodology indicated that it was properly conducted according to standard procedures.

This case does not represent our first exposure to the perils involved in cruising. Our predecessor court observed in *Caffall Bros. Forest Products, Inc. v. United States,* 230 Ct.Cl. ——, 678 F.2d 1071 (1972), that cruising is more of a guess than a science, producing wide margins of error on both sides of the estimates. *Id.* at ——, 678 F.2d at 1077. At trial, Ranger Angwin, who signed the Haskell Salvage Sale contract for the government, stated that while a 10% error was common for a green timber sale, he would expect a greater spread in the case of a salvage sale. While cruisers try to be as accurate as possible, apparently the Forest Service feels quite strongly that they should not be bound by their estimates. This was evidenced by the Forest Service's rejection of a proposal, advanced by the industry, that a 10% margin of error be warranted in timber contracts, and the industry has apparently decided not to pursue its recommendation where timber is marked prior to sale advertisement.

Plaintiffs in this case were not inexperienced, and it is difficult to understand how they can claim to have misunderstood contract terms which appear obvious to even the inexperienced. They claim to have thought they were getting 555 MBF of net volume unsound sapwood when the fact that the stumpage price for this wood was discounted 60% would lead anyone to either know, or at the very least to inquire, as to whether the volumes were gross amounts. They also insist that this was a scaled sale by amount when the sale was clearly advertised as a 100% pre-marked salvage sale. Beyond that, plaintiffs ignored Forest Service admonitions to view the sale area for volume before signing the contract. Lastly, plaintiffs appear to have left a large volume of timber which was intended to be included in the contract in the sale area to deteriorate. Under the circumstances, the court agrees with defendant that plaintiffs demonstrated a certain lack of diligence in entering into and performing this contract. It is unfortunate, from plaintiffs' points of view, that the actual timber volumes marked for harvest did not meet or exceed estimates. However, those estimates were not so deficient as to give rise to liability on the part of the government.

Based on the above, I find that plaintiffs are not entitled to recover, and, accordingly, dismiss the petition.