**CEDAR LUMBER, INC.**

v.

**The UNITED STATES.**

No. 356–80C.

United States Claims Court.

June 4, 1984.

Joseph A. Yazbeck, Jr., Portland, Or., attorney of record, for plaintiff; Allen & Yazbeck, Portland, Or., of counsel.

Stephen G. Anderson, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; James Kauble, Department of Agriculture, Portland, Or., of counsel.

## OPINION

MEROW, Judge:

In this litigation plaintiff seeks damages for breach of contract on the Upper Sardine timber sale contract awarded by the United States Forest Service, Department of Agriculture, to plaintiff on May 5, 1976. Trial has been held and both parties have filed post-trial briefs. Pursuant to RUSCC 42(c) the court issued an order subsequent to trial limiting the issues for present decision to liability for breach. Since the court finds in favor of the plaintiff on the issue of liability, further proceedings are required to resolve the amount of recoverable damages, if any.

Plaintiff asserts several breach of contract claims against the Forest Service. Plaintiff claims that the Forest Service estimate of road construction costs in the contract was so grossly inadequate that it breached the warranty of reasonable accuracy. Plaintiff further claims that defendant's delay in furnishing design plans was a breach of contract resulting in increased logging and construction costs and, moreover, that plaintiff was forced to "cover" its loss during the delay period by purchasing logs elsewhere at a price higher than the cost of timber under the Upper Sardine contract. Plaintiff also asserts that defendant's refusal to utilize a revised cost guide to price additional work after contract award was a breach of contract.

Defendant counters that its estimates for road construction were not warranties and, even if they were construed as such, the estimates were not so grossly inaccurate as to constitute a breach of the warranty of reasonable accuracy. Defendant admits that there was a delay in furnishing the design plans but it contends that plaintiff contributed to the delay. Defendant maintains that since there were at best concurrent causes of delay attributable to both parties, neither party is liable in damages. Even if defendant did breach the contract, it insists that plaintiff's sole remedy is an extension of time under the provisions of the contract.

### Facts

On May 5, 1976 the Forest Service entered into the Upper Sardine timber sale contract with Cedar Lumber, Inc. The contract provided for the sale of approximately 8 million board feet of merchantable timber and 212 acres of "per-acre" material from the Detroit Ranger District in the Willam-

ette National Forest. In addition to removing timber from the sale area over a five-year period, Cedar was required to perform road construction to facilitate logging and removal of the timber. Cedar was to reconstruct 10.6 miles of existing roads (designated as Segments "A," "B" and "C" of S915 and S915F) as well as construct 3.41 miles of new roads (designated as S915 Segment D, S915J, S915L and S915M). Surveying, design and construction staking of the reconstruction roads were performed prior to contract award by the Forest Service. Surveying and construction of the new roads were the responsibility of the timber purchaser (Cedar) while the design of the new construction roads was to be performed by the Forest Service after contract award.

To compensate plaintiff for the road construction, the contract specified a certain number of timber "purchaser credits" which would be applied against amounts due the Forest Service for timber logged and hauled from the sale area. To arrive at the appropriate sum of purchaser credits, the Forest Service surveyed the sale area and estimated the amount and type of rock to be excavated during road construction. The terrain was a combination of "common," "rippable" and "solid" rock. Using the "Zone V Cost Estimating Guide for Road Construction," the Forest Service would apply the total cubic yards of excavation and derive a "base" cost from the guide. To arrive at the total number of purchaser credits, the base cost would be multiplied by a factor of one to arrive at the per unit cost of common excavation, a factor of two for rippable rock excavation and a factor of three for solid rock excavation. For instance, if the base cost were $0.50, then each unit of common excavation would be priced at $0.50, each unit of rippable rock at $1, and each unit of solid rock at $1.50. The purchaser credits for road construction at the time of contract award were totalled at $296,960, of which $141,560 was allocated to reconstruction of existing roads and $155,400 was allocated to new construction.

The Forest Service purchaser credits reflect only the direct cost of road construction and do not include amounts for inflation, risk, overhead, profit or timber removal from the right-of-way. With this fact in mind, Brent Walker, Cedar's purchaser representative, prepared the bid for the Upper Sardine timber sale contract. Walker investigated the site of the new construction prior to bidding without the assistance of a construction subcontractor. Since he was bidding for timber, he had to estimate the amounts of merchantable timber, the costs of processing, the sale price and the road construction costs in order to determine what bid price would yield a profit. Walker priced the road construction component of Cedar's bid 22 percent higher than the Forest Service estimate of purchaser credits anticipating that the construction contractor's price, which was not received prior to contract award, would exceed the Forest Service estimate by that percentage. Past experience with construction contractors in bidding on timber sale contracts with the Forest Service had borne out this variance.

Cedar solicited bids for the road construction in December 1976 and the lowest bid received was $445,000 from Lloyd Hill, to whom the subcontract was awarded. Hill's bid was prepared by Jerry Bunde, an experienced engineer, who "walked" the site prior to bidding. Hill's bid exceeded the pre-design purchaser credits by 55 percent. Another firm, Parkett Logging Co., submitted a bid in the amount of $557,051. A third contractor, North Santiam Paving Co., declined to bid, asserting that it could not perform the job "for anywhere near the credits." After the Forest Service completed the post-design estimate for the new road construction it raised the purchaser credits for new construction from $155,400 to $290,330. The purchaser credits for reconstruction of roads remained the same at $141,560. Thus, the purchaser credits for road construction, including the survey work, were put at $431,890. Due to some further changes and technical errors, the final amount of post-design purchaser credits reached $451,170. Plaintiff paid a total

of $672,663.67 to Lloyd Hill, which included a 10 percent increase for rescheduling the start of work from 1977 to 1978.

The post-design estimates for new construction performed after the contract was awarded revealed that the construction contractor would have to excavate a greater amount of solid rock than was previously estimated. For instance, on Segment "D," a new construction road, the pre-design estimate showed 40,000 cu. yds. of common rock, 10,000 cu. yds. of rippable and 3,510 cu. yds. of solid rock. The post-design estimate for the same road showed 32,270 cu. yds. of solid, 13,800 cu. yds. of rippable and 15,280 cu. yds. common rock.[1] The plaintiff has maintained that such a dramatic difference in the amount of solid rock changed the essential nature of the job from a common one to a solid rock job. Hence, the cost guide utilized for the pre-design estimates with the premise that this was a common job was inappropriate for use in what was essentially a solid rock job. Furthermore, a revised cost guide had come into effect between the publication of the pre-design purchaser credits and the post-design purchaser credits and Cedar maintains that the new guide would have provided more current and accurate pricing. If the newer guide had been used, the purchaser credits would have been greater for the post-design excavation quantities than that allowable under the earlier guide. The Forest Service, however, maintained that their utilization of the cost guide was mandated in light of contract clause B5.21 "Engineering" which read in pertinent part:

The methods of computing such revised costs [post-design purchaser credits] shall be consistent with the methods that would have been used had the engineering been performed prior to sale advertisement.

### Delay Claims

The Forest Service did not provide final design plans to plaintiff until November 1977, after the 1977 construction season. Plaintiff claims it was entitled to these plans in time to commence work during 1977.

Under clause C5.21 of the timber contract[2] plaintiff was required to submit an operating and an engineering schedule reflecting when the various construction activities would take place. Tom Albert, a Forest Service engineer, testified that Cedar did not submit an "engineering" schedule in accordance with the clause but submitted only an "operating" schedule. An engineering schedule differs from an operating schedule in that an engineering schedule reflects the timetable for *pre* construction activities, such as when the survey notes will be complete and when the 180 days for design preparation by the Forest Service should begin. An operating schedule sets forth the timetable for construction activities such as clearing, grubbing,[3] and excavation.

Defendant contends that the failure to submit an engineering schedule contributed to the delay in furnishing the design plans to Cedar as the Forest Service was consequently unaware of the priority attached to the project by Cedar and, hence, it could not draw up its own timetable for preparation of the design plans. Plaintiff, on the

---

**1.** Similarly, the pre-design excavation quantities for the "J" spur were 14,690 cu. yds. common, 3,650 cu. yds. rippable, and 1,280 cu. yds. solid. Post-design quantities differed greatly: 5,800 cu. yds. common, 5,190 cu. yds. rippable, and 8,370 cu. yds. solid.

**2.** *C5.21#—Engineering Schedules* (5/73) reads in pertinent part:
"Purchaser shall furnish a schedule to Forest Service of specific dates for the start and completion of the required engineering work. The schedule of engineering work shall be submitted to Forest Service for approval within 60 days after contract award and prior to beginning work. Purchaser's schedule shall reflect the specified length of time * * * needed by the Forest Service to complete work shown as Forest Service responsibility. * * *." It was the responsibility of the Forest Service to furnish the post-design plans for the new construction roads within a specified period of time—180 days.

**3.** "Grubbing" is the clearing and breaking up of land by digging.

other hand, insists that the design plans were due 180 days after submission of the P-line survey[4] notes, not after submission of the engineering schedule. Although clause C5.21 is not plain in indicating when the 180-day period is triggered, the testimony at trial of both Joe Ragsdale, district ranger, and Val Russell, Forest Service engineer, strongly suggested that the running of the 180-day contractual period for furnishing the post-design plans commenced upon submission of the P-line survey notes. Furthermore, the Forest Service could begin preparation of the design with the survey notes but could not do so with only an engineering schedule. Cedar subcontracted the responsibility for the survey notes to Olsen & Associates. Preliminary survey notes were submitted to the Forest Service on November 15, 1976. It was not until December 6, 1976 that the survey notes were deemed compatible with the Forest Service requirements and therefore usable.

A "pre-work" meeting was held on February 22, 1977 during which plaintiff informed Forest Service officials that it planned to begin work on June 1. The Forest Service maintained that this was the first time they learned of plaintiff's intention to begin construction on June 1, 1977. The Forest Service indicated that it would try to have the design plans ready by June 1 but they gave no assurances that they would meet that deadline, as they considered they were not contractually bound to do so.

Defendant asserts that the delay in furnishing the design plans was attributable to the plaintiff due to plaintiff's request to employ "long-span skylining,"[5] rather than "medium-span skylining" on the sale. Brent Walker had previously proposed such a plan in December 1976 but Arden Corey, then district ranger, denied the request. Defendant contends that Walker reopened the issue with Charles Graham, the new district ranger, sometime in March 1977, although Graham could not remember exactly when the meeting took place. A follow up "on-the-ground" meeting took place in June 1977, at which Graham maintains he agreed to long-span skyline the sale. No notes, however, were made about what transpired during that meeting nor could Mr. Graham explain why, after he approved the long-span skylining plan, the plan was subsequently dropped.

### Stake-Out Notes

Defendant insists that plaintiff could have begun construction, more specifically, construction staking, if it had picked up the "stake-out" notes prepared by the Forest Service when they were ready on August 8, 1977. The stake-out notes were preliminary to the final design and defendant maintains they could have been used to begin work. Plaintiff's subcontractor, Lloyd M. Hill, did not pick up the stake-out notes until August 29. Although defendant maintains that Cedar could possibly have begun construction with just the stake-out notes and without the final design plans, Joe Ragsdale, district ranger for the Detroit district, testified that it was not "general practice" to proceed with construction with just stake-out notes.

On September 13, 1977, prior to receipt of the final design plans from the Forest Service, Walker requested a contract adjustment in the form of a time extension (a "force majeure") commencing June 1, 1977 until the road design plans for the Upper Sardine timber sale were accepted by Cedar. Charles Graham recommended a 153-day extension but shortly thereafter reduced his recommendation to 98 days. Ce-

---

4. The purchaser was responsible for conducting the P-line survey. This required a survey crew who would travel to the site and survey the slope of the land and the profile of the land and gather data from which the Forest Service could prepare a computer design of the road.

5. A skyline logging system consists of a carriage and an overhead cable which spans the logging area and leads to a loading area. The felled logs are hoisted onto the carriage and transported to the loading area where they are hauled off to the mill. In a long span system the cable is 2,000 feet in length. In a medium span system the cable is less than 1,000 feet in length.

dar Lumber disagreed with the 98 days, insisting that the completed plans were due May 23, 1977 in accordance with clause C5.21 [6] and, further, that the completed plans were not received until November 15, 1977. Thus, 98 days would be an insufficient contract adjustment. The Forest Service granted plaintiff a contract extension of 153 days in recognition of plaintiff's loss of operating time from June 1, 1977 (the start of the operating season) to October 31, 1977 (the end of the normal operating season).[7] In computing the extension, Mr. Ragsdale utilized November 15, 1976 as the date on which the survey notes were accepted and, thus, the date on which the 180 days for furnishing the design plans began to run. Hence, the original termination date of March 31, 1981 was extended to October 31, 1981.

In January 1978 Cedar submitted an operating schedule indicating its intention to begin construction during the 1978 operating season (June 1 through October 31). Another prework conference was held on March 7, 1978, which was attended by representatives from Cedar, Lloyd M. Hill and the Forest Service. At this meeting Cedar noted its concern that the post-design purchaser credits would not provide adequate compensation for the costs Cedar would incur with the new road construction. Cedar submitted substantiation of these concerns to the Forest Service in a letter dated March 23, 1978. The Forest Service responded by letter dated April 25, 1978 asserting that the purchaser credits for the post-design roads were formulated in accordance with the contract provisions and thus could not be recalculated. Further, in response to Cedar's delay claims, the Forest Service maintained that Cedar had obtained a contract extension due to the delay in furnishing the design plans and that was the only remedy for delay to which Cedar was entitled.

Work progressed despite the denial of Cedar's claim by the Forest Service on May 16, 1978. Cedar's subcontractor, Lloyd M. Hill, did not complete the reconstruction and new construction roads during the 1978 operating season as originally anticipated. Rather, the work was completed over a four-year period. In 1978 Hill performed clearing, grubbing and a major portion of excavation and culvert work.[8] In 1979 poor weather conditions delayed construction of new roads and reconstruction of existing roads although some drainage structures were installed. In 1980 all the reconstruction was completed except for paving of roads and most new construction was completed. In 1981, the last year of the contract as extended under the contract adjustment clause, Hill did general "clean-up" work and completed the job.

Cedar took an appeal of the denial of its claims to the Department of Agriculture Board of Contract Appeals (AGBCA) on February 28, 1979. The AGBCA dismissed the appeal for want of jurisdiction, concluding that the contract provisions provided no remedy for Cedar's claims. Cedar then instituted the present litigation.

*Discussion*

Plaintiff asserts that defendant's estimate of purchaser credits for road construction were grossly inadequate and, thus, defendant breached the warranty of reasonable accuracy of such estimates.

Ordinarily, estimates incorporated in a contract are not totally meaningless as this would run counter to the basic principle of contract construction that no provision of a contract should be construed as mere surplusage. *McGrew-Sawmill Bros., Inc. v. United States*, 224 Ct.Cl. 740, 745 (1980). Generally an estimate in a bidding invitation will represent "honest and in-

---

6. For text of clause C5.21, *see supra*, note 2.

7. Mr. Graham drafted the memo approving the 153-day extension which was in turn signed by Mr. Ragsdale. No mention was made of the items now asserted by defendant as contributing to the delay in furnishing the plans—*i.e.*, the long-span skyline proposal, delay in providing an engineering schedule and delay in picking up stake-out notes.

8. A "culvert" is a drain running transversely under a road.

formed conclusions" by the government and will be based on "all relevant information that is reasonably available to it." *Womack v. United States,* 182 Ct.Cl. 399, 412–13, 389 F.2d 793, 801 (1968). Estimates in a timber contract such as estimates of merchantable or recoverable timber or purchaser credits estimating the costs of road construction may be warranted where the purchaser is induced to rely on such estimates and is under no duty to ascertain the facts independently. *Everett Plywood & Door Corp. v. United States,* 190 Ct.Cl. 80, 91, 419 F.2d 425, 431 (1969). An estimate in a timber contract which forms the very basis of the bargain between the parties may be a strict warranty, any deviation from which gives rise to an action for breach of contract, *Everett Plywood,* 190 Ct.Cl. at 90–91, 419 F.2d at 430–31, or the estimate may have a warranty of "reasonable accuracy" on which a purchaser acting prudently is entitled to rely but which permits some flexibility for error before it gives rise to breach of contract. *Timber Investors, Inc. v. United States,* 218 Ct.Cl. 408, 417–20, 587 F.2d 472, 476–78 (1978); *Caffall Bros. Forest Products, Inc. v. United States,* 230 Ct.Cl. 517, 529–30, 678 F.2d 1071, 1078 (1982).

■ It is, however, possible to draft provisions in a contract such that estimates are rendered meaningless, thus shifting the risk of erroneous estimates to the purchaser. *McGrew-Sawmill,* 224 Ct.Cl. at 746. For instance, if the contract and bid documents incorporate an unmistakable, unequivocal disclaimer employing the words "disclaimer" and "warranty," *Webco Lumber, Inc. v. United States,* 230 Ct.Cl. 457, 463, 677 F.2d 860, 863 (1982), or if the purchaser warrants in the contract that it relies on its own information for bidding purposes and not on the information embodied in a government estimate, *Gregory Lumber Co. v. United States,* 230 Ct.Cl. 1041, 1043 (1982), the warranty of reasonable accuracy in the bidding estimate will be a nullity. *Webco Lumber,* 230 Ct.Cl. at 463, 677 F.2d at 863. In *Webco* the govern-

ment erred by 31 percent in estimating the amount of recoverable timber. The court ruled that the clear, unequivocal disclaimer in the contract, coupled with the purchaser warranty that it would rely on its own site investigation and its own estimate of recoverable timber, knocked out the warranty of reasonable accuracy articulated in *Timber Investors.* A disclaimer, no matter how clear and unequivocal, however, may not insulate the government from a breach of contract action if the estimate is grossly erroneous or negligently prepared, *Timber Investors,* 218 Ct.Cl. at 415 n. 4, 587 F.2d at 475 n. 4, particularly where the estimates such as that in the present case concern purchaser road credits. *Id.; see Webco Lumber,* 230 Ct.Cl. at 465, 677 F.2d at 864 (where the court rejected the theory of breach of contract for grossly erroneous estimates accompanied by a strong disclaimer in the context of recoverable timber estimates while noting that the result might be different in the context of road construction estimates).

■ Even where a disclaimer is less than clear and unequivocal there may be a nullification of the warranty of reasonable accuracy if special facts are present which put the purchaser on notice that it should be wary in its reliance on the estimates set forth in the contract documents. *Clearwater Forest Industries, Inc. v. United States,* 227 Ct.Cl. 386, 388, 650 F.2d 233, 235 (1981). *Clearwater* involved a timber "deficit" sale where purchasers were on notice that the sale would not have sufficient value to realize a normal profit as calculated under the Forest Service appraisal system. *Id.* at 388, 650 F.2d at 235. Thus, a deficit sale, coupled with a disclaimer of the accuracy of timber estimates, truncated the warranty of reasonable accuracy.

Likewise, in *Deal v. United States,* 3 Cl.Ct. 151 (1983), there were no specific disclaimers of the timber estimates but the fact that the sale was a "timber salvage sale by area" [9] put purchasers on notice

**9.** A "salvage sale by area" is sale of dead, dying

and downed timber marked or designated for

that reliance on the timber estimate in the contract would be misplaced. Furthermore, bidders were given a strong warning that they should inspect the site and ascertain the estimated timber values on their own. The court held on these facts that the estimates were not warranted as reasonably accurate. Although the contractor had made allegations that the estimate (or "cruise") was not conducted in a reasonable manner and thus may have reflected a lack of due care in its preparation, the court concluded that the estimate which was erroneous by a 16 percent factor was prepared in accordance with the proper methodology and thus no negligence was attributable to the government and, hence, no breach.

■ Similarly, if it is not industry practice to rely on estimates in timber contracts, any reliance would be unreasonable and, hence, there would be no recovery for breach of warranty of reasonable accuracy. *Caffall Bros. Forest Products, Inc. v. United States*, 230 Ct.Cl. 517, 528, 678 F.2d 1071, 1077 (1972); *McGrew-Sawmill Bros. v. United States*, 224 Ct.Cl. 740, 745 (1980). In *Caffall Bros.* the government had included in the contract documents an estimate of recoverable timber which was coupled with a purchaser credit limit against stumpage payments[10] for the cost of required road construction. The amount of recoverable timber was 26.4 percent less than estimated in the contract documents, leaving the purchaser with unused purchaser credits. The contract did contain a strong disclaimer of the timber estimates and the purchaser had an adequate opportunity for site investigation and in fact performed an investigation of the timber area with its forestry personnel. The court in *Caffall* held that, even in the absence of a strong *Webco* disclaimer, there would be no warranty of reasonable accuracy of an estimate if the purchaser is instructed to rely upon its own estimate and does in fact

substantially rely upon it and, further, there would be no warranty where it is not industry practice to interpret the Forest Service estimates as guarantees. *Caffall Bros.*, 230 Ct.Cl. at 528, 678 F.2d at 1077; *cf. Timber Investors*, 218 Ct.Cl. at 418–19 & n. 7, 587 F.2d at 477–78 & n. 7 (where the court found it was industry practice to rely on purchaser credit estimates for road construction in Forest Service contracts).

■ The instant case is governed by the warranty of reasonable accuracy in *Timber Investors*. Here, the purchaser credit estimates appeared in both the bid prospectus and the contract documents but there was *no* bid or contract provision disclaiming their accuracy. Furthermore, the purchaser was not instructed to perform its own site investigation, *Caffall Bros. Forest Products*, 230 Ct.Cl. at 528, 678 F.2d at 1077, and although Cedar did perform a pre-bid site investigation, it did not warrant that it would rely on the results of such investigation. *Gregory Lumber*, 230 Ct.Cl. at 1043. In performing its own site investigation of the terrain to estimate the road construction costs, it is significant that Cedar was a timber purchaser and not a road construction contractor and, thus, was not in a position to reengineer or rework the Forest Service estimates. *Timber Investors*, 218 Ct.Cl. at 418 n. 7, 587 F.2d at 477 n. 7. Moreover, it was not industry practice to solicit bids from road subcontractors prior to the timber purchaser submitting a bid on a timber sale to the Forest Service. Thus, the Forest Service would have been aware that Cedar would reasonably rely on the Forest Service estimate and, therefore, the Forest Service, not Cedar Lumber, would have assumed the risk of an erroneous estimate. Lastly, there were no "special" facts such as those in *Clearwater Forest* and *Deal, supra*, which would have put Cedar on notice that reliance on the estimates would not be justified.

cutting in a specified *area*. Thus, if there is more timber than estimated in the area, the purchaser receives a bonus. If there is less timber than estimated, there is no obligation on

the part of the Forest Service to make up the deficiency.

10. "Stumpage" payments are payments for the value of standing timber.

An additional fact in the instant case bearing on the existence of a warranty of reasonable accuracy is that the original purchaser credits were subject to revision after contract award based upon the results of a Forest Service design of new construction roads. Thus, while it appears that the *original* purchaser credits were not warranted as "unchanging and inflexible," *Clearwater Forest Industries*, 227 Ct.Cl. at 395, 650 F.2d at 239, the warranty of reasonable accuracy, which is not a strict warranty, would still apply to the original estimate. The original estimate of the new construction reflected a predominantly "common" rock job. A contract provision providing for a "revision" of the estimate does not put a purchaser on notice that the job will be transformed in *character* from a common one to a solid rock job. The post-design estimates here did in fact reflect such a dramatic transformation. The solid rock excavation amounts as well as the purchaser credits rose dramatically with the Forest Service post-design estimates. For instance, the pre- and post-design estimates of solid rock for road segment "D" were 3,510 cu. yds. and 32,270 cu. yds., respectively, representing a 900 percent increase in the amount of solid rock with a commensurate *decrease* in the estimated amount of common rock. In fact, the estimated amount of solid rock for all new construction (segments D, J, L and M) increased over 800 percent between the pre-design estimate (a total of 5,190 cu. yds.) and the post-design estimate (a total of 42,827 cu. yds.). Such a substantial variation in estimates raises a strong inference of negligent preparation of the estimates. *Timber Investors*, 218 Ct.Cl. at 415 n. 4, 587 F.2d at 475 n. 4.

Similarly, the purchaser credits for the new road construction increased dramatically after the post-design estimate was completed. These purchaser credits were originally estimated at $155,400. In the post-design estimate they rose to $313,558 (including survey work) representing a more than 200 percent increase in estimated costs.

Thus, the warranty of reasonable accuracy of the pre-design purchaser credits was breached and plaintiff is entitled to recover increased road construction costs.

### Cost Guide Claim

Plaintiff claims that the cost guide used by the Forest Service was not tailored for excavation involving large amounts of solid rock, thus suggesting that it was improper for the Forest Service to utilize it for the post-design estimates. Plaintiff corroborates this view by showing that the guide itself indicated it was designed for a "common" job, one in which common rock would preponderate. If the guide were appropriate for use with a "solid" job, plaintiff maintains it would have been marked for "unclassified" excavation. Cedar also asserts that even if the cost guide were appropriate for a "solid" job, defendant improperly interpreted the cost guide in calculating excavation costs for the new construction roads. The underlying premise of the cost guide is that as excavation amounts increase, excavation costs decrease. In arriving at a per unit excavation cost, the Forest Service takes the *total* amount of excavation of all projects within a five-mile radius by reading horizontally along the cost guide graph to that amount. The Forest Service then determines a "base" cost for the excavation by reading vertically to the descending slope of unit costs. A factor of one is applied to the base cost to arrive at the per unit cost of common excavation, a factor of two is applied to the base cost for rippable excavation and a factor of three is applied to the base cost for each unit of solid excavation.

Plaintiff maintains that the proper method of calculating the post-design excavation costs is to take the total amount of common excavation [11] only (which is necessarily a lesser amount than total excavation) and

---

**11.** It was not clear from testimony at trial whether plaintiff would use a total common excavation amount for all roads within a five- mile radius or if plaintiff would use a common excavation amount for each individual road in the overall project.

arrive at a "base" cost (which would be necessarily higher than the base cost for *total* excavation). Plaintiff, like the Forest Service, would then apply a factor of one to the base cost to compute the unit cost of common excavation, a factor of two to the base cost to compute the unit cost of rippable excavation, and a factor of three to the base cost to arrive at the unit cost of solid excavation. Neither the interpretation by the Forest Service nor by the plaintiff is mandated by the cost guide.

■ It is concluded that the Forest Service interpretation of the cost guide is reasonable. The guide was utilized such that plaintiff was compensated for the rock component of the job. The price for each unit of common rock was multiplied by three to arrive at a price for the solid excavation. Thus, the cost guide did reflect the differences between a common job and a rock job, contrary to plaintiff's assertions.

Moreover, the use of the 1975 cost guide in pricing the post-design purchaser credits was reasonable in light of the contract language contained in clause B5.21 mandating that computation of post-design purchaser credits be "consistent with the methods that would have been used had the engineering been performed prior to sale advertisement." Plaintiff insists that the post-design estimates should have been priced in accordance with the most current pricing data available at the time the purchaser credits were revised. This would have necessitated use of the *1976* cost guide. However, the direction that the post-design purchaser credits be "consistent with" methods employed prior to contract award requires the use of the same guide for both the pre- and post-design estimates. Thus, the use of the 1975 guide to price both the pre- and post-design credits was proper. The ordinary definition of the term "consistent" is "having agreement with itself or something else," "congruous." Thus, a reasonable interpretation of the clause is that the same guide and, hence, the same unit prices, must be used for both the pre- and post-design estimates.

The reasonableness of this interpretation is particularly evident in view of the basic purpose of the provision at issue which is to revise purchaser credits to accommodate physical changes in the terrain discovered after contract award. Although the clause does not expressly preclude an increase in unit costs after contract award, neither does it contemplate such an increase.

Thus, the Forest Service did not breach the contract by employing the same cost guide for both the pre-design and post-design estimates.

### Delay Claims

Plaintiff claims that it suffered damages, specifically, increased logging and construction costs, and the cost of replacement timber ("cover") due to defendant's breach in failing to furnish the post-design plans in a timely fashion as required under the contract, thus delaying plaintiff's entire schedule of operations for one year and rendering plaintiff unable to perform its contractual obligations.

■ In addition to the promise of positive performance under a contract, there is an implied obligation on both parties to cooperate and not to hinder the performance of the other party. 11 Williston on Contracts §§ 1296, 1316 (W. Jaeger 3rd ed. 1968); *L.L. Hall Construction Co. v. United States*, 177 Ct.Cl. 870, 878, 379 F.2d 559, 563 (1966); *George A. Fuller Co. v. United States*, 108 Ct.Cl. 70, 94, 69 F.Supp. 409, 411 (1947). If a specific warranty appears in the contract, breach of that warranty is tantamount to breach of the duty to cooperate, thus giving rise to a breach of contract action. *United States v. Foley*, 329 U.S. 64, 67, 67 S.Ct. 154, 155, 91 L.Ed. 44 (1946) *rev'g* 105 Ct.Cl. 161, 63 F.Supp. 209 (1945); *Commerce International Co. v. United States*, 167 Ct.Cl. 529–35, 338 F.2d 81, 85 (1964). Even in the absence of a specific warranty an unreasonable delay attributable to the government may breach the obligation not to hinder the performance of the other party. *Commerce International*, 167 Ct.Cl. at

536, 338 F.2d at 85; *Chalender v. United States*, 127 Ct.Cl. 557, 563, 119 F.Supp. 186, 190 (1954). *Per se* delay, however, will not give rise to a breach of duty to cooperate. *Broome Construction Co. v. United States*, 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974); *Commerce International*, 167 Ct.Cl. at 536, 338 F.2d at 85. Rather, it is necessary to look to the "particular contract, its context and its surrounding circumstances." *Commerce International*, 167 Ct.Cl. at 336, 338 F.2d at 86. Specifically, it is necessary to look to the magnitude of the failure to cooperate and the impact of that failure on the purchaser's operations. *Lewis-Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 199, 550 F.2d 26, 29 (1977). Minor errors or minor hindrances would not be sufficient to constitute breach. *Id.* For example, in the instant case, if the Forest Service delay in furnishing the design plans had been merely a short time, *i.e.*, two or three weeks, such that the plans were furnished late but in time for Cedar to start construction during the 1977 operating season, there would have been a delay due to the fault of the government but not a delay of sufficient magnitude to breach the duty not to hinder or unreasonably delay. *Id.*

▮ In the absence of a specific warranty, fault is a necessary ingredient to an action for breach of the duty of cooperation. *Koppers/Clough v. United States*, 201 Ct.Cl. 344, 363 (1973); *L.L. Hall Construction Co. v. United States*, 177 Ct.Cl. 870, 879, 379 F.2d 559, 564 (1966). It is plaintiff's burden to show fault. Defendant may, of course, then attempt to negate liability by showing that the government conducted itself in a diligent, good faith manner, *United States v. Foley*, 329 U.S. at 67, 67 S.Ct. at 155, or to show that the delay was excusable. *George A. Fuller Co. v. United States*, 108 Ct.Cl. 70, 101, 69 F.Supp. 409, 415 (1947).

▮ In the absence of evidence excusing or justifying the delay, fault will be presumed. *L.L. Hall Construction Co.*, 177 Ct.Cl. at 879, 379 F.2d at 564.

▮ No matter how unreasonable the delay by defendant, in order to recover the plaintiff must show that the delay caused material damage. *Commerce International*, 167 Ct.Cl. at 542, 338 F.2d at 89. Broad generalities will not suffice for specificity in linking the government-caused delay to the impact on plaintiff's operations, here, a one-year delay in commencing road construction due to the failure to furnish design plans. *Id.* Furthermore, if the unreasonable delay attributed to defendant is meshed with other delays attributable to plaintiff, there may be no recovery, unless there is a "clear apportionment of the delay and the expense attributable to each party." *Pittman Construction Co. v. United States*, 2 Cl.Ct. 211, 217 (1983); *John McShain, Inc. v. United States*, 188 Ct.Cl. 830, 835, 412 F.2d 1281, 1284–85 (1969); *Commerce International*, 167 Ct.Cl. at 543, 338 F.2d at 90.

Here, defendant maintains that the delays were the result of actions attributable to the plaintiff or, at best, that any delays caused by defendant are interspersed with those caused by plaintiff, such that the causes of delay cannot be separated, *Broome Construction Co. v. United States*, 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974), thus barring recovery by plaintiff. Defendant asserts that plaintiff contributed to the delay in furnishing the design plans because plaintiff failed to submit an engineering schedule and resurrected the idea of long-span skylining which would have eliminated the need for some design planning.

### Engineering Schedule

▮ Defendant insists that, pursuant to clause C5.21,[12] submission of an engineering schedule was a prerequisite to the running of the 180-day period for furnishing the post-design plans by the Forest Service. Since defendant maintains that plaintiff did not submit an engineering schedule in a

**12.** For text of clause C5.21 *see supra* note 2.

timely fashion, but rather submitted only an operating schedule, the Forest Service was not obligated to furnish the post-design plans in time for Cedar to begin work during the 1977 construction season. Testimony by Forest Service employees taken together with documents prepared by Forest Service employees belie the assertions of defendant. Mr. Joe Ragsdale, then Forest Service district ranger, testified that, in general, the supplying of the survey notes,[13] not the engineering schedule, by the purchaser to the Forest Service triggered the running of the 180-day period for furnishing the design plans under C5.21. This testimony from defendant's own witness contradicts defendant's position in this litigation. Furthermore, Mr. Ragsdale stated in a memo to the Forest Supervisor on January 31, 1978 that, in accordance with clause C5.21, the 180-day period for furnishing the design plans commenced on November 15, 1976, the date Cedar originally submitted the survey notes to the Forest Service and, further, he recommended that the contract be extended a full operating season (153 days). On February 4, 1978 the Forest Supervisor officially extended the contract performance period by 153 days, thus adopting Mr. Ragsdale's recommendations. The evidence presented at trial strongly points to the conclusion, contrary to defendant's assertions, that the Forest Service did not interpret clause C5.21 as requiring an engineering schedule prior to the preparation of the post-design plans by the Forest Service. It is concluded that the 180-day period for furnishing the design plans began to run upon plaintiff's submission of the survey notes to the Forest Service. Hence, plaintiff's failure to submit an engineering schedule did not contribute to the delay in furnishing the design plans.

### Long-Span Skylining Proposal

▮ Defendant maintains that plaintiff's proposal to employ long-span skylining for the Upper Sardine timber sale frustrated defendant's preparation of the design plans because such a proposal would have eliminated the need to prepare a design for the new road segment J and would have altered the design plans for the new road segment D. Not wishing to draw up plans futilely, defendant insists that, while the long-span proposal was pending, it could not complete the design plans.

Defendant maintains that Brent Walker, Cedar's purchaser representative, approached Charles Graham, then district ranger, sometime in March 1977 to discuss the long-spanning idea but Mr. Graham had no clear recollection of just when this meeting occurred. Mr. Graham asserted that he approved the long-spanning plan at an "on-the-ground" meeting with Cedar on June 29, 1977 but no explanation is provided why the plan was mysteriously abandoned thereafter. There are no contemporaneous records of what transpired at June 29th meeting. This event is conspicuously absent from the diary of Val Russell, a Forest Service employee, who attended the meeting and who kept a regular diary of significant events at work. Furthermore, purported design plans which could have provided support for the Forest Service assertion that plaintiff raised the long-span skylining proposal, were not produced at trial and apparently no longer exist. Finally, it is noted that the Forest Service apparently concluded soil classification tests on the *entire* segment D on July 6, 1977. This act would not be consistent with a design plan prepared during the same time reflecting a shortened segment D to accommodate a long-span skylining proposal.

Finally, although defendant maintains that it was the long-spanning proposal which contributed to the Forest Service delay in furnishing the plans, this contribution to the delay was *not* mentioned by the Forest Service when (1) Tom Albert, Forest Service engineer, recommended a 71-day extension of the contract performance period, or (2) when Joe Ragsdale recommended to the Forest Supervisor a 153-day extension of the performance period, and (3)

**13.** *See* note 4, *supra.*

finally, when the Forest Supervisor himself approved the final 153-day extension.

It is concluded that no long-span skylining proposal(s) by plaintiff served to justify any delay by defendant in preparation of the design plans.

### Excusability

■ The government is generally liable for delay damages it causes in the absence of a clause exempting it from such liability. *George A. Fuller Co.,* 108 Ct.Cl. at 96, 69 F.Supp. at 412. Since the Upper Sardine sale contract contained no suspension of work clause, defendant maintains that the contract adjustment clause, B8.21,[14] provides the only remedy (*i.e.,* an extension of time) for delay in furnishing the design plans. Defendant relies principally on *Rice v. United States,* 317 U.S. 61, 65, 63 S.Ct. 120, 123, 87 L.Ed. 53 (1944), *rev'g* 95 Ct.Cl. 84 (1941), and *Foley v. United States,* 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946), *rev'g* 105 Ct.Cl. 161, 63 F.Supp. 209 (1945), for this proposition. Both cases are inapposite here. In *Rice* the court found that the contract terms did not bind the government to have a building ready for the plaintiff-contractor at a fixed time, unlike the case at bar where defendant was contractually bound to furnish plans within a specified time after plaintiff furnished the survey notes to the Forest Service. Furthermore, in *Rice* the defendant reserved the right to make changes which might occasion such a delay. Hence, there was no breach of contract and plaintiff was properly compensated with an extension of time only. Like *Rice* the court in *Foley v. United States,* 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946), ruled that defendant was not liable for breach where there was a significant delay in making the work site available. The court found that the defendant had not expressly warranted that the site would be available at a certain time

and, further, unlike the present case, the court found that defendant was without fault in causing the delay and that it had acted "with great, if not unusual, diligence." *Id.* at 67, 67 S.Ct. at 155.

■ If the contract adjustment clause at issue had been clear, express and not in violation of public policy in restricting a contractor's remedy for government-caused delay to an extension of time only, then no action could be maintained for breach. *Wells Brothers Co. v. United States,* 254 U.S. 83, 87, 41 S.Ct. 34, 35, 65 L.Ed. 148 (1920), *aff'g* 54 Ct.Cl. 206 (1919). In *Wells* plaintiff brought a breach action for delays caused by the government. The contract contained a clause reading "no claim shall be made or allowed to the contractor for any damages which may arise out of any delay caused by the United States." Such plain, unambiguous language was held to preclude an action for breach.

■ The provision in Cedar's contract is not as clear as that in *Wells.* The pertinent clause provides for an extension of time for events "beyond the Purchaser's control" so that an extension of time would be appropriate for an "act of the government," an event beyond plaintiff's control. This language does not, however, preclude damages for an act of the government which constitutes a breach of contract. When the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent. *Dep't of Natural Resources and Conservation of Montana v. United States,* 1 Cl.Ct. 727, 734 (1983). Here, the intent to limit relief solely to a contract term extension is not explicit. The contract provision cannot be construed as providing the sole remedy for a government-caused delay.

Rather, the clause appears to relate to the obligation of the contractor to pay actu-

---

**14.** Clause B8.21 "Contract Term Adjustment" reads in pertinent part:

"[T]he contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost * * * [when] (a) Purchaser ex-

periences delay in starting scheduled operations * * * due to causes beyond Purchaser's control, including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods."

al damages if it fails to cut designated timber by the contract termination date in accordance with clause B9.4.[15] *See George A. Fuller Co. v. United States*, 108 Ct.Cl. 70, 97, 69 F.Supp. 409, 413 (1947) (where the contract contained a clause providing for an extension of time for completion of the work due to delays from unforeseen causes including those by the government, it was held that the clause related to an assessment of liquidated damages and did not contemplate relieving the government of liability for damages for government-caused delays).

Thus, defendant's contention that the contract adjustment clause provided the only remedy for delay caused by the defendant is not sustained.

### Damages

■ Although defendant has not established any relevant contribution by plaintiff to the government's delay in furnishing design plans, defendant further maintains that plaintiff was dilatory in obtaining the stake-out notes with which defendant insists Cedar could have begun work before the close of the construction season. Defendant insists that Cedar could have picked up the stake-out notes as early as August 8, 1977, which would have enabled plaintiff to commence work. Plaintiff's subcontractor, Lloyd Hill, did not pick up the notes until August 29. However, it is not considered that this action by plaintiff's subcontractor was a viable cause of plaintiff's delay in commencing work. It is unclear from trial testimony how diligent the Forest Service was in its effort to contact Cedar and inform it that the stake-out notes were ready. The testimony of Joe Ragsdale indicated that it was not industry practice to begin construction work with stake-out notes only. Thus, according to the defendant's own witness, completed design plans would generally be necessary to commence construction work.

Moreover, defendant has not demonstrated that even if plaintiff had obtained the stake-out notes on August 8 that it could have mitigated damages by beginning construction staking in the short time which remained in the operating season. It is probable that any staking performed late in the season would have to be done again in the next season due to the imminence of snowy weather and the threat that the staking would be washed away by snow melt. Thus, there is scant evidence to show that plaintiff, acting prudently, could have begun construction after August 8, 1977 if it had had the stake-out notes in its possession.

Defendant also maintains that plaintiff could have mitigated damages in several other ways, all of which may be the subject of further exploration in further proceedings concerning damages.

First, as of May 9, 1977 Cedar had purchased six other timber sales, any one of which defendant insists Cedar could have logged during the same five-year period as the Cedar contract and, thus, Cedar could have simply reordered the sequence of its logging operations without increasing its overall costs. In addition to these six sales, Cedar purchased several other sales in the years 1978–81 which, again, might have been logged before the Upper Sardine sale.

Defendant further contends that Cedar could have sought permission from the Forest Service to log timber over existing

---

15. Clause B9.4 "Failure To Cut" reads in pertinent part:

"In the event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination date, Forest Service shall appraise remaining Included Timber, unless termination is under B8.22. Such appraisal shall be made with the standard Forest Service method in use at time of termination.

"Damages due the United States for Purchaser's failure to cut and remove such timber meeting Utilization Standards shall be the amount by which Current Contract Value plus the cost of resale, less any effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchaser Credit."

roads in accordance with clause B5.23 [16] prior to reconstruction of these roads and this action would have provided Cedar with 2,500,000 net board feet of merchantable timber equivalent to one season's worth of logs.

Defendant also insists that Cedar permitted Hill to complete road construction in four operating seasons rather than in one operating season as originally planned in the March 1978 "pre-work" meeting between Cedar and defendant. Since Hill did not complete work until 1981, this necessarily delayed Cedar's logging operations on the Upper Sardine. There was testimony at trial from Mr. Bunde, Lloyd M. Hill's engineer, that the road construction might have been completed in two seasons. Any extra costs incurred by Hill in meeting such a deadline, however, would have been unreimbursable under Hill's fixed-price contract with Cedar.

Lastly, defendant contends that a contract term adjustment had greater value to Cedar than monetary compensation because timber sales offered in 1977 with a five-year term were more valuable than timber sales offered in 1976 with the same performance period. Defendant maintains that the contract term adjustment enhanced the value of the Upper Sardine sale by $350,000. *See Cordec Development Corp. v. Santiago Vasquez*, 539 F.2d 256, 261–62 (1st Cir.1976). Plaintiff disputes defendant's .method of valuing the time adjustment and insists that defendant's evidence is inconclusive on this issue.

### Conclusion

Based on the foregoing considerations, it is concluded that plaintiff has established defendant's liability for breach of contract with respect to the pre-award estimates and the delay in providing final design plans. Accordingly, by separate order, pretrial proceedings are reinstated in order that the issue of damages can promptly

receive full consideration by counsel and a further trial, if then required, can be scheduled.

---

16. Clause B5.23 entitled "Use of Partially Constructed Road" reads in pertinent part:

"Portions of specified roads shall be substantially completed prior to their use for hauling timber from each established landing, except that Purchaser may be relieved in writing of the requirement if there is justification under existing conditions."